## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| JOHN DEE CARRUTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | 7:17-cv-1445-LSC |
| ROBERT J. BENTLEY and | ) | |
| DAVID BYRNE | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF OPINION

Before the Court is the Motion to Dismiss (doc. 5) and Motion under Rule 41(d) (doc. 6) filed by Defendants, former Governor of Alabama Robert J. Bentley ("Bentley") and former legal advisor to the governor David Byrne ("Byrne") (collectively "Defendants"). In their Motion to Dismiss, Defendants argue that the Complaint filed by Plaintiff John Dee Carruth ("Carruth") is due to be dismissed because it violates the Court's Scheduling Order in the action *Carruth v. Smyth*, 7:15-1098-LSC (N.D. Ala.), and because the Complaint fails to state a claim upon which relief can be granted. In their Motion under Rule 41(d), Defendants argue they are entitled to recover costs and attorneys' fees incurred in *Carruth v. Smyth* defending against the same claims asserted against them in this action.

Carruth has responded to both Motions. He argues the Motion to Dismiss is due to be denied as the maintaining of this action after the prior voluntary dismissal of his claims against Defendants in *Carruth v. Smyth* does not violate the Court's Scheduling Order. He likewise disputes Defendants' arguments that he has failed to state a claim. In regards to Defendants' Motion under Rule 41(d), Carruth argues that Defendants' reading of Rule 41 misinterprets the plain language of the Rule; in any case, according to Carruth, the facts of this case do not support an award of costs or attorneys' fees.

For the reasons that follow, Defendants' Motion to Dismiss is due to be GRANTED; Defendants' Motion under Rule 41(d) is due to be GRANTED in PART and DENIED in PART.

## I. FACTS[1]

Alabama One Credit Union ("Alabama One") is a member owned, not-for-profit, federally insured credit union chartered by the State of Alabama in 1951. Alabama Credit Union Administration ("ACUA") is a state agency responsible for chartering, regulating, and supervising Alabama's state-chartered credit unions. The ACUA Administrator is responsible for leading the ACUA on a day-to-day

---

[1] In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] the facts in the light most favorable to the plaintiff." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012).

basis. Larry Morgan ("Morgan") was the ACUA Administrator from February 2011 to March 24, 2014. Among other responsibilities, the ACUA regularly examines each Alabama credit union, which involves the ACUA reviewing financial and administrative records of such credit union to ensure the safety and soundness of its operations. The ACUA also works collaboratively with the National Credit Union Administration ("NCUA"), the federal agency that regulates credit unions. Based on its findings, the ACUA has the authority to issue Memoranda of Understanding ("MOUs"), Letters of Understanding and Agreement ("LUAs"), Cease and Desist Orders ("C&Ds"), and Conservatorship Orders.

Carruth became the CEO of Alabama One in May 1997. During Carruth's eighteen-year tenure as CEO, Alabama One experienced significant growth. However, Carruth's time as CEO ended on August 27, 2015, when the ACUA issued an Order of Conservatorship over Alabama One; took possession and control of Alabama One's business and assets; and the acting Administrator terminated Carruth's employment.

## A. THE ALLEGED CONSPIRACY

On December 6, 2011, the NCUA and ACUA issued a joint LUA against Alabama One. The LUA required Alabama One to hire an outside law firm to

investigate Carruth's employment contract and Alabama One's loans to senior management and their relatives. Under the LUA, Alabama One hired an outside accounting firm to perform a fraud audit, loan accounts verification, and internal control review. Alabama One complied with all aspects of the December 2011 LUA and the LUA was then lifted. Neither the law firm nor the accounting firm found evidence of fraud on Carruth's part.

In the summer of 2013, attorney Justice D. "Jay" Smyth, III ("Smyth") filed several lawsuits on behalf of various clients against Alabama One and Carruth related to loans made to Alabama One member Danny Butler ("Butler"). Carruth and Alabama One responded to these lawsuits by defending themselves and refusing to settle the claims. Smyth then attempted to pressure Alabama One and Carruth to settle these suits by contacting his former law partner Byrne, who was then serving as chief legal advisor to Governor Bentley. He also reached out to Alabama state senator Gerald Allen ("Allen"). Smyth asked these politically powerful individuals to help him pressure Alabama One into a settlement with Smyth's clients. On November 18, 2013, Smyth emailed Allen, referencing a meeting in Montgomery about Alabama One, stating that "conditions at Alabama One have only deteriorated since the earlier investigation conducted by ACUA," and "express[ing] his desire for the Governor to direct the ACUA to pick up where

it left off in 2009 with respect to Alabama One." (Doc. 1 ¶ 72 (internal quotations omitted).) Smyth, Byrne, Bentley and Allen met on November 25, 2013 to "'speak freely' about 'Alabama One Issues' and . . . to confer and decide 'what actions would seem to be most . . . appropriate for the State of Alabama.'" (*Id.* ¶ 65.) On January 24, 2014, Smyth, Byrne, Morgan, Williams, NCUA examiners, ACUA examiners, and a former Alabama One employee Lori Baird ("Baird") met in Montgomery. At this meeting, Smyth and Baird presented "inside information to the attendees about wrongdoings on the part of Alabama One." (*Id.* ¶ 68 (internal quotations omitted).)

Next, on February 4, 2014, Smyth sent an email to Senator Allen, copying Byrne and an ACUA board member, which stated that Alabama One "has become so impaired that the only responsible action would be for the [ACUA] to take prompt remedial action against Alabama One." (*Id.* ¶ 74.) This email specifically requested that Alabama One be conserved and some of its employees suspended. He sent another email to Byrne and Allen about Alabama One on February 12, 2014. When Byrne's executive assistant acknowledged receipt of this email, Smyth responded by saying "I believe now that everyone (perhaps with the notable exception of Larry Morgan) is on the same page re Alabama One issues. I have

confidence that the Governor will act decisively on this." (*Id.* ¶ 77 (emphasis and italicization omitted).)

On February 13, Smyth emailed Byrne, Allen, Williams, and others, stating that the plaintiffs in his suits against Alabama One "continue to hope for prompt and effective remedial action against Alabama One by the ACUA acting in concert and coordination with the Governor's office . . . the results from the courthouse will not materialize soon enough to save them." (*Id.* ¶ 78.) He sent another email on February 22, this time copying NCUA Problem Case Officer Kim Brown, Byrne, Allen, an Assistant United States Attorney, and an FBI agent. Among other statements, the email said that Smyth "underst[ood] that the Governor and his lawyers conferred with ACUA Director Larry Morgan about the gravity of these problems," but that he was "gravely concerned about the pace of urgently needed remedial action." (*Id.* ¶ 79.) He also made a statement about how Morgan should be made to "realize that his action (or his inaction) is receiving scrutiny from a whole range of different people." (*Id.*) He sent another email on February 24, this time asking Byrne, Allen, and others to "stay further proceedings" in one of his lawsuits against Alabama One. (*Id.* ¶ 80.)

## B. CARRUTH IS SUSPENDED

On February 27, during a deposition in one of his lawsuits against Alabama One, Smyth threatened Alabama One's attorney, saying "[i]f you don't settle our lawsuits today and pay us money today, the regulators will do bad things to Alabama One tomorrow." (*Id.* ¶ 86.) The next day, the ACUA suspended Carruth and three other Alabama One employees. At this time, there were no ACUA or NCUA sanctions pending against Alabama One or any of its employees. Smyth responded to this news by sending Byrne an email thanking him for his involvement with Alabama One.

On March 3, 2014, Carruth and the other suspended Alabama One employees filed an action in the Circuit Court of Montgomery County against Morgan and the ACUA, seeking to have the suspensions voided. Over the next few days, Smyth sent various emails to politically powerful individuals, advocating that Alabama One be conserved. Meanwhile, the ACUA reached an agreement with the employees and they returned to work without limitation or restriction. However, in order to return to work, the ACUA required the employees to sign an agreement that contained a liability release. They did so on March 21, 2014.

The business day after Carruth and the other employees were reinstated, Morgan resigned from his position as Administrator of the ACUA. Morgan admitted that at the time he resigned from his position, the ACUA had found

nothing to justify the imposition of any regulatory sanctions against Alabama One or any of its employees.

## C. Regulatory action under Moore

Following Morgan's resignation, Byrne contacted Sarah Moore ("Moore") as Morgan's successor as Administrator of the ACUA. According to Carruth, Byrne specifically discussed Alabama One with Moore and characterized Alabama One as a "large problem" that she was going to have to deal with. Bentley appointed Moore as Morgan's successor on April 15, 2014, and she took office on July 1, 2014.

A few days after becoming Administrator, Moore informed Carruth that she was going to direct another examination of Alabama One by a third party. She hired the auditing firm Carr Riggs to perform the examination, which took place over the course of four weeks in August 2014. Prior to the completion of the examination, the ACUA and NCUA issued a Preliminary Warning Letter ("PWL") directing Alabama One to stop making Member Business Loans ("MBLs"). The PWL also sanctioned Alabama One for entering into a settlement in one of Smyth's lawsuits against Alabama One. At the conclusion of the examination, the ACUA and NCUA imposed another LUA on Alabama One.

Smyth emailed, called, and texted Moore numerous times following her hiring as Administrator of the ACUA regarding Alabama One. In a series of text messages dated September 17, 2014, Smyth told Moore that he had communicated with Byrne about Alabama One and informed Moore that Smyth was a former law partner of Byrne.

In April 2015, the ACUA issued a C&D against Alabama One. This order required Alabama One to engage additional outside sources to review its loans and its management. It also informed Alabama One that the next regulatory step would be to place the credit union into conservatorship. On April 24, 2015, the ACUA published the C&D on its website and conveyed it to the news media.

Finally, on August 27, 2015, the Board of the ACUA, which consists of the Administrator and seven other credit union executives appointed by the Governor, met for an executive session. ACUA and NCUA officials made presentations to the ACUA Board on Alabama One, recommending that Alabama One be placed into conservatorship and advising Moore as to which Alabama One employees should be terminated. The meeting culminated with the ACUA Board voting to conserve Alabama One. In the Order of Conservatorship, the ACUA appointed itself as conservator and then delegated all power and authority of the conservator to Moore. Moore then terminated Carruth's employment on the same day.

## II. STANDARD OF REVIEW

To survive a 12(b)(6) motion to dismiss, a plaintiff must generally satisfy the pleading requirements in Fed. R. Civ. P. 8. Rule 8 requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–679 (2009). Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id*. at 678 (internal quotations omitted). *Iqbal* establishes a two-step process for evaluating a complaint. First, the Court must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. Factual allegations in a complaint need not be detailed, but they "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A party need not specifically plead each element in his or her cause of action, but the pleading must contain "enough information regarding the material elements of a cause of action to support recovery under some viable legal theory." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011). Ultimately, the Court must be able to draw a reasonable inference from the facts that the other party is liable. *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215 (11th Cir. 2012). The Court must construe pleadings broadly and resolve inferences in the non-moving party's favor. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006).

## III. MOTION TO DISMISS

The Court first addresses the arguments Defendants advance in favor of dismissal of Carruth's Complaint under Rule 41(b), before considering their challenges to the sufficiency of Carruth's allegations under Rule 12(b)(6).

### A. RULE 41(B)

Defendants argue that this action should be dismissed under Rule 41(b) for failure to comply with this Court's Scheduling Order in *Carruth v. Smyth* (the "Smyth Lawsuit Scheduling Order.") Under Federal Rule of Civil Procedure 41(b), a Court may dismiss an action where "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order. . . ." The

Smyth Lawsuit Scheduling Order was entered on February 4, 2016, and provides that no new parties may be added by Carruth after March 3, 2016 to *Carruth v. Smyth*. *See* Scheduling Order, *Carruth v. Smyth*, 7:15-cv-1089-LSC (N.D. Ala. Feb. 4, 2016). Defendants argue that Carruth has violated the Smyth Lawsuit Scheduling Order by first dismissing Byrne and Bentley from *Carruth v. Smyth* on January 30, 2016, later re-suing Byrne and Bentley in this action, and finally attempting to consolidate the two actions. By the time Carruth began the present action, the deadline for adding parties as set out in the Smyth Lawsuit Scheduling Order had passed. *Compare* Doc. 1 (filed on August 25, 2017) *with* Motion to Consolidate Cases, *Carruth v. Smyth*, 7:15-cv-1089-LSC (N.D. Ala. Oct. 25, 2017). Defendants argue that Carruth's voluntary dismissal and later refiling works as a de facto run around of the *Carruth v. Smyth* Scheduling Order, and that such conduct should lead to the dismissal of this action.

Rule 41(b)'s wording is general in allowing a defendant to move for dismissal of an action or a claim where the plaintiff fails to comply with a court order or rule. In regards to Rule 41(b), the Eleventh Circuit has stated that: "dismissal with prejudice is plainly improper unless and until the district court finds a clear record of delay or willful conduct and that lesser sanctions are inadequate to correct such conduct." *Betty K Agencies, Ltd. v. M/V MONADA*, 432 F.3d 1333, 1339 (11th Cir.

2005). As it is the most extreme sanction imposed on a party, dismissal with prejudice under Rule 41(b) "is to be used *only* in extreme circumstances." *Boazman v. Econ. Lab., Inc.*, 537 F.2d 210, 212 (5th Cir. 1976) (emphasis added). Courts generally avoid using this most grave sanction as "[i]n the past, [Eleventh Circuit precedent] have found that lesser sanctions would suffice in all but the most flagrant circumstances." *Id.*

Defendants rely on two unpublished opinions' interpretation of Rule 41(b) for their argument that this action is subject to dismissal for the way that Carruth dismissed Defendants from *Carruth v. Smyth*, and then later re-sued Defendants in this action. The first cited by Defendants, *Bateman Harden PA v. Francis*, differs from this action because it largely turned on the defendant's waiver for failure to bring a compulsory counterclaim under Fed. R. Civ. P. 13(a)(1). 2012 WL 3689402 (N.D. Fla. Aug. 27, 2012). In *Bateman Harden*, the plaintiff, an attorney, filed suit in federal court against his former client for recovery of attorney's fees from the plaintiff's prior representation of the defendant (the "fee action"). The defendant answered, but did not assert any counterclaims. One year later, the defendant filed suit in state court, asserting malpractice and tort claims against his former attorney arising out of the same dispute that was still pending in federal court (the "malpractice action"). The state court determined that the malpractice action

arose out of the same transaction and occurrence as the fee action and transferred the action to the Northern District of Florida for consolidation. *Bateman Harden* determined that the defendant had waived his counterclaims by not bringing them in the fee action within the time for amending pleadings, regardless of whether the defendant-client later brought the malpractice action in state court. *Id.*, at *4.

*Bateman Harden* does not inform the parties' dispute here, because the operative core of that action turned upon the defendant's failure to bring a compulsory counterclaim. This action does not involve compulsory counterclaims. Although in *Bateman Harden* there is an admitted similarity to Carruth's conduct in the way the defendant attempted to "make an end run around" the deadline for amendment under that court's scheduling order, the basis for the dismissal of the defendant's counterclaims involved no pertinent analysis. *Bateman Harden* made no finding that there was a clear record of delay or willful conduct or a discussion of whether lesser sanctions were inadequate to correct such conduct. The more ministerial application of Rule 13 does not inform the application of Rule 41(b) as to Carruth's claims.

Defendants alternatively point to the reasoning in *Jordan v. City of Taylor* to advance their Rule 41(b) argument. 2015 WL 4724900 (E.D. Mich. Aug. 10, 2015). *City of Taylor* is at a glance supportive of dismissal. In *City of Taylor*, the plaintiff

was an inmate who was found alive but comatose and incapacitated in the defendants' correctional facility. The plaintiff's conservator later brought suit against various local entities and officials for deliberate indifference to a medical need under 28 U.S.C. § 1983. Some months later, after the deadline to amend his complaint had already passed, plaintiff sought leave to amend his complaint to add certain officers he believed to be liable under § 1983. The court denied that motion, noting that the plaintiff had known the identity and involvement of those officers before bringing his suit. Undeterred, the plaintiff sued those officers in a separate federal action, and then sought to consolidate the two actions. *City of Taylor* denied the motion to consolidate and dismissed the newly filed action under Rule 41(b) for the plaintiff's litigation misconduct, because "it is inescapable that Plaintiff's filing of the second Complaint was a blatant attempt to evade a Court Order and a clear abuse of the litigation process." *Id.*, at *2.

Carruth's attempt to consolidate *Carruth v. Smyth* with this action was certainly misguided, but it was not made in such blatant disregard of the Court's prior rulings that Carruth's behavior should subject this action to dismissal under Rule 41(b). Carruth obviously did not abuse the litigation process by re-filing this action against the Defendants who had previously been dismissed without prejudice from *Carruth v. Smyth*. Although Defendants argue they "relied" on

Carruth's voluntary dismissal—apparently assuming that Carruth would not seek to later re-file his claims against Byrne and Bentley—Defendants do not explain how this reliance is reasonable. So while Defendants did not take part in certain depositions of parties occurring in the *Carruth v. Smyth* action, they had ample information before them to determine that Carruth could still file a separate suit within the applicable statute of limitations.

This action is similar to *City of Taylor* in that Carruth attempted to consolidate his later-filed case with *Carruth v. Smyth*. But the Court had not specifically ordered that Carruth could not add Bentley and Byrne to the *Carruth v. Smyth* action, as the court in *City of Taylor* had done. The willful disregard of a Court order is not present—conceptually, a lower mens rea culpability such as negligence would better describe Carruth's conduct. To the extent Defendants' Motion to Dismiss is premised upon Carruth's attempt to consolidate this action with *Carruth v. Smyth*, it is denied.

## B. RULE 12(B)(6)

In addition to Rule 41(b), Defendants also assert that Carruth's Complaint is due to be dismissed in its entirety under Federal Rule of Civil Procedure 12(b)(6) because its allegations are insufficient to state a claim. The Court first considers

Defendants' claims of absolute and qualified immunity, before considering the sufficiency of Carruth's claims.

### i. ABSOLUTE IMMUNITY

Defendants first argue they are entitled to absolute immunity under *Butz v. Economou*. 38 U.S. 478 (1978). In *Butz,* the Supreme Court determined that the absolute immunity reserved for judicial officers can be extended to other federal and state officials who are required to exercise discretionary authority in a "quasi-judicial" nature. 438 U.S. 478 (1978). While it is well settled that judges and prosecutors are entitled to absolute immunity, *see Stump v. Sparkman*, 435 U.S. 349, 355 (1978) (judicial immunity) and *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976) (prosecutorial immunity), the Supreme Court has been "quite sparing" in extending absolute immunity. *Forrester v. White*, 484 U.S. 219, 224 (1988). *Butz* held that in addition to these judicial officers, agency officials "performing certain functions analogous to those of a prosecutor" are immune from civil liability resulting from such acts. *Butz*, 438 U.S. at 515. However, the "general rule" as stated by *Butz* is that qualified immunity—and not absolute immunity—from damages liability should be the norm. *Id.* at 508. *Butz* slightly cracked the door to absolute immunity, but also closed it from being thrown open as Defendants' theory would require.

Defendants do not attempt to show how their actions entitle them to *Butz* absolute immunity under the non-exhaustive list of factors supplied by *Butz*. *See id.* at 512 (listing factors including "[t]he insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal). The Court need not make Defendants' argument for them, and even a cursory review of *Butz* would show that Defendants as "higher officers of the executive branch" are not entitled to *Butz* absolute immunity:

> In *Scheuer v. Rhodes,* [416 U.S. 232 (1974)] the issue was whether "higher officers of the executive branch" of state governments were immune from liability under § 1983 for violations of constitutionally protected rights. There, the Governor of a State, the senior and subordinate officers of the state National Guard, and a state university president had been sued on the allegation that they had suppressed a civil disturbance in an unconstitutional manner.
>
> . . .
>
> Although quoting at length from *Barr v. Matteo*, [360 U.S. 564 (1959)] we did not believe that there was a need for absolute immunity from § 1983 liability for these high-ranking state officials. Rather the considerations discussed above indicated [that such officials are only entitled to qualified immunity].

*Id.* at 496-97 (footnote omitted). Because Defendants have presented no argument why the Court should depart from clear precedent on this matter, they are not entitled to absolute immunity.

### ii. QUALIFIED IMMUNITY

Defendants' claims for qualified immunity are more robust. To be potentially eligible for qualified immunity, an official must be engaged in a "discretionary function" when performing the acts of which the plaintiff complained. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). If the official is unable to prove that he was acting within his discretionary authority, he is not entitled to qualified immunity. *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003) ("If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity."). "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). "To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly

established at the time of the alleged violation." *Holloman*, 370 F.3d at 1264 (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)).

Defendants contend that they are entitled to qualified immunity because the actions of which Carruth complains were all undertaken in their discretionary authority. To determine whether Defendants acted in their discretionary authority, the Court must ask whether their actions "(1) were undertaken 'pursuant to the performance of [their] duties,' and (2) were 'within the scope of [their] authority.'" *Dang ex rel Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). "In applying each prong of this test, [the court] look[s] to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266. In other words, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (citing *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (emphasis added)). "Where a plaintiff alleges that the defendants 'engaged in a myriad of unlawful and improper conduct, only the

conduct that caused [the plaintiff's] alleged constitutional injury is relevant to the discretionary authority inquiry.'" *Id.* (citing *Harbert Int'l, Inc.*, 157 F.3d at 1283).

Defendants were acting within their discretionary authority when they allegedly directed Moore and the ACUA Board to vote to conserve Alabama One and terminate Carruth. Ala. Code § 5-17-8 provides for the Administrator of the ACUA to take part in the issuance of a cease and desist order and the imposition of conservatorship over Alabama credit unions. Defendant Bentley was certainly within his discretionary authority granted to him as the "supreme executive power of this state," Ala. Const. Art. V, § 113: "when the governor determines that, whether due to inaction or inadequate action by the other official, it is necessary for him to act lest the law go unenforced, he may act." *Riley v. Cornerstone Cmty. Outreach, Inc.*, 57 So. 3d 704, 722 (Ala. 2010). Likewise, Defendant Byrne, as Defendant Bentley's legal advisor, acted according to Defendant Bentley's wishes; *See* Ala. Code § 36-13-2 (allowing for the employment of attorney or attorneys by the Governor of Alabama). As the Court has found that Defendants were acting within their discretionary authority, it now turns to each of the claims brought by Carruth to determine whether Defendants are entitled to qualified immunity on those claims.

### a. EQUAL PROTECTION

Carruth claims Defendants' role in the imposition of a conservatorship over Alabama One and later termination of his employment violated his rights to equal protection under the law. In order to show violation of the Equal Protection Clause under a class-of-one theory, Carruth must show (1) Moore intentionally treated him differently from others *similarly situated* and (2) that there was no rational basis for the disparate treatment. He does not claim that he belongs to a protected class such as race or gender. Instead, Carruth bases his equal protection claim on the "class-of-one" theory as recognized in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). (*See* Doc. 13 at 17 ("[T]his case involves a like-for like comparator that is identical in every material respect to Alabama One and Carruth when Alabama One was conserved and Carruth terminated. That comparator is the 2012 and 2013 versions of Alabama One and Carruth.").)

In *Olech*, a property owner and her late husband had asked the Village of Willowbrook to connect their property to the municipal water supply. 528 U.S at 563. Although the village had required only a 15–foot easement from other property owners seeking access to the water supply, the village conditioned the plaintiff's connection on a grant of a 33–foot easement. *Id.* The plaintiff sued the village, claiming that the village's requirement of an easement 18 feet larger than the norm violated the Equal Protection Clause. *Id.* Although the plaintiff had not alleged that

the village had discriminated against her based on membership in an identifiable class, the Supreme Court held that her complaint stated a valid claim under the Equal Protection Clause because it alleged that she had "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564.

*Engquist v. Oregon Department of Agriculture* dealt with whether a public employee can state a claim as a "class of one" under the Equal Protection Clause with no assertion that the different treatment was based on her membership in any particular class. 553 U.S. 591 (2008). The plaintiff in *Engquist* sued her former employer, the Oregon Department of Agriculture, alleging that she was discriminated against on the basis of her race, sex, national origin, and *as a class of one* after the plaintiff was subjected to multiple employment sanctions eventually resulting in her termination. *Id.* at 594-95. In analyzing the plaintiff's class-of-one claim, the Supreme Court returned to its holding in *Olech* to clarify:

> What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard *against which departures, even for a single plaintiff, could be readily assessed*. There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations—at least not with regard to easement length, however typical such determinations may be as a general zoning matter.

*Id.* at 602–03 (emphasis added). Thus, *Engquist* continues, the class-of-one analysis does not lend itself well to situations:

> which by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.[2]

*Id.* at 603.

The Court cannot envision a better example of discretionary decision-making than whether to conserve a Credit Union and terminate certain of its

---

[2] *Engquist* presents as an example:

> Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself—the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

*Id.* at 603-604.

employees. It involves a "vast array of subjective, individualized assessments" as well as a number of objective assessments. On its own, allowing Carruth to assert his class-of-one claim would destroy the discretion the Defendants must exercise in order to do their job properly to say nothing of Carruth's additionally shaky "past comparator" argument.

Even if *Olech*'s recognition of a class-of-one theory was applicable to Carruth, which it is not, Carruth cites no case suggesting, let alone establishing, that a plaintiff in an equal protection case can use himself as a comparator.[3] The Court instead has found much to the contrary in case law and as a matter of common sense. The Supreme Court and the Eleventh Circuit have always described equal protection claims as based on differential treatment between one person, or a group of people, and "*others* similarly situated." *E.g.*, *Olech*, 528 U.S. at 564 (emphasis added). Accepting that Carruth could use himself as his own comparator would have broad implications, "converting any claim of retaliation (for any reason) into an equal protection case, and effectively eliminating the differential treatment element of equal protection claims," *Snyder v. Gaudet*, 756 F.3d 30, 36 (1st Cir. 2014). Allowing Equal Protection claims to examine the

---

[3] Indeed such an argument appears to only be possible in a "class of one" case, as a person alleging discrimination upon the basis of "immutable characteristics" such as race could never conceivably show their past self was not in the same protected class.

treatment of one, and only one individual, would subject all government action to unlimited review. Carruth cannot hijack the Equal Protection Clause in service of his desire to challenge the conservatorship over Alabama One. Such a specious argument belittles the meaning and import of the Equal Protection Clause.

Thus, because Carruth has not identified a valid comparator showing he was treated "differently from *others* similarly situated," *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007) (emphasis added) and because the class-of-one analysis is inappropriate in this circumstance, Carruth has failed to show that Defendants have violated his constitutional right to equal protection. The Court does not reach Carruth's burden to show that the right was clearly established at the time of the alleged violation. Defendants are entitled to qualified immunity on Carruth's equal protection claim. *Holloman*, 370 F.3d at 1264.

### b. Due Process Claims

Carruth additionally asserts that Defendants violated his due process rights. After review of Carruth's Complaint (doc. 1) it is indisputable that he has alleged that Defendants violated his substantive due process rights. (*See* Doc. 1 at 74 (styling Count III as "42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS)"); *id.* ¶ 187 ("Defendants, acting under color of state law, violated Carruth's substantive due process rights under the Fourteenth Amendment to the United States

Constitution.").) Strangely, Carruth in his Response to Defendants' Motion to Dismiss, appears to assert that Defendants have violated his *procedural* right to due process. He cites a number of cases, which deal with procedural due process claims, but not substantive due process.

In *Carruth v. Moore*, 7:16-cv-1935-LSC, the Court faced the same conundrum before it now, wherein Carrruth asserted a substantive due process claim in his complaint, but then in opposition to a Motion to Dismiss argued that count was actually for a violation of procedural due process. In its Memorandum of Opinion and Order, the Court gave Carruth the benefit of the doubt by construing his complaint as alleging a violation of procedural due process rather than as alleging a violation of substantive due process as clearly alleged. The Court made clear that Carruth's substantive due process claim appeared facially deficient. (*See* Doc. 62 at 15 n.4, *Carruth v. Moore*, 7:16-cv-1935-LSC (N.D. Ala. Aug. 8, 2017).

Not even three weeks after the entry of that Memorandum of Opinion and Order, Carruth asserted violations of substantive due process in his Complaint in this action against Defendants for the same acts or omissions complained of in *Carruth v. Moore*. Carruth again has argued that Defendants violated procedural due process—and not substantive due process—in his Response in Opposition to Defendants' Motion to Dismiss. It appears that either (1) Carruth truly intends to

assert violations of substantive due process or (2) simply believes that the Court will construe the obviously deficient substantive due process claims in his complaint as procedural due process claims. In either case, the Court declines to yet again re-write Carruth's complaint for him, and construes his Count III as it is written. It likewise goes without saying that Carruth cannot now amend his Complaint through response to Defendants' Motion to Dismiss. Carruth offers no argument to show how Defendants violated his substantive due process rights or that this right was clearly established. The Court cannot imagine how Defendants have violated Carruth's substantive due process rights, and thus this claim is due to be dismissed. *See McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) ("[A]reas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because substantive due process rights are created only by the Constitution." (quotation omitted)).

### c. TAKINGS CLAIM

Carruth additionally asserts that Defendants' role in Moore and the ACUA's conservation of Alabama One amount to a *per se* taking in violation of the Fifth Amendment because Defendants "terminat[ed] his employment contract with Alabama One and direct[ed] and/or caus[ed] Alabama One to refuse to honor

Carruth's contractual right to indemnity for all legal fees and expenses he incurred in the Appeal." (Doc. 1 ¶ 171.) In his Response in Opposition to Defendants' Motion to Dismiss, Carruth offers only a skeletal recitation of general principles concerning "categorical takings" without showing how Defendants committed an unconstitutional taking. Carruth's argument to show an unconstitutional taking amounts to, in total:

> In the takings context, there are two different types of takings – regulatory and categorical. A categorical taking, which Defendants do not even address, occurs when the government action destroys all economic benefit of a seized property. In such instances, "it has a categorical duty to compensate the former owner". The principle that the government cannot seize and destroy private property without adequate compensation is certainly clearly established. And this Court has also previously held in the *Smyth* case that Carruth's contractual rights are constitutionally protected.[4]

---

[4] Carruth argues this Court has previously held that his "contractual rights are constitutionally protected," (doc. 13 at 17), citing a previous Memorandum of Opinion and Order of this Court in *Carruth v. Smyth*. Mem. Of Opinion and Order at 11-12, 7:15-cv-1089-LSC (N.D. Ala. Mar. 29, 2016). After review of the cited portion of the Court's previous Memorandum, it is unclear what Carruth is referring to when he states the Court held his contractual rights are constitutionally protected.

At one point the Court, recounting Carruth's allegations, stated: "[Carruth] claims a violation of his substantive due process rights through a deprivation of his property and liberty interest in his employment contract." *Id.* at 12. The Court later stated in relation to the *total sum* of seven different allegations, one of which was the statement concerning Carruth's employment rights, that "A fact finder could reasonably infer from the facts alleged that Carruth's rights were violated." *Id.* In any case, the Court is not somehow estopped by this broad statement in *Carruth v. Smyth* from taking a second, detailed look at Carruth's allegations of unconstitutional interference with his contractual rights—especially considering that qualified immunity is implicated in this action, and was not in *Carruth v. Smyth*.

(Doc. 13 at 16-17 (citations omitted).) Carruth's reasoning as stated above is insufficient to show a takings violation.

The Takings Clause—"nor shall private property be taken for public use, without just compensation," U.S. Const., amend. V—applies to the taking of all private property, be it an estate in land, riparian rights, or a valid contract made according to state law. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 713 (2010); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984). Nonetheless, the Court must "resort to 'existing rules or understandings that stem from an independent source such as state law' to define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." *Lucas v. S.Carolina Coastal Council*, 505 U.S. 1003, 1030 (1992). Carruth's argument stumbles over Alabama state law's treatment of employment contracts made with credit unions.

While Alabama law of course creates a protectable property right in employment contracts generally, Alabama credit unions are limited in the property rights they may create by private agreement. Ala. Code § 5-17-8(m) provides:

> After taking possession of the property and business of a credit union through conservatorship, *the conservator may terminate or adopt any executory contract to which the credit union may be a party.* The termination of any contracts shall be made within six months after the conservator has obtained knowledge of the existence of the contract or lease. Any provision in the contract or lease which provides for

> damages or cancellation fees upon termination shall not be binding on the conservator or credit union. The directors, the conservator, and the credit union are not liable for damages arising from or relating to such executory contracts.

(emphasis added). Ala. Code § 5-17-8(m) focuses on the power of the conservator to terminate any executive contract, but said another way this section does not grant credit unions the legal ability to create a contract that cannot be terminated by a conservator. Carruth had no claim or entitlement to continued employment under Alabama law upon conservatorship of Alabama One, because credit unions in Alabama do not possess the ability to create executory contracts that are not subject to termination upon conservation by the ACUA. In the same way that "[p]arties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them," *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224 (1986) (citation omitted), Carruth and Alabama One lacked the legal ability to create an employment contract that is not subject to termination under Alabama law. Ala. Code § 5-17-8 does not purport to limit the ACUA's discretion in terminating such executory contracts, nor require a showing of cause. Any contract made by Alabama One, including the contract made with Carruth, is subject to this general exception to these actors' contractual capacity under Alabama law. The Takings Clause is not implicated because Defendants have in no way deprived Carruth of existing property rights as defined by Alabama law.

### d. RIGHT TO PETITION CLAIM

Carruth additionally argues that Defendants interfered with his right to petition the Courts under the First Amendment. He appears to base this claim on the timing of the conservation order, which occurred one day after Carruth and Alabama One amended the complaint in the case *Carruth v. Smyth*, 7:15-cv-1089-LSC to add Bentley and Byrne as defendants. From the style of pleadings in Carruth's Complaint and Response in Opposition to the Motion to Dismiss, Carruth actually appears to be arguing that Defendants *retaliated* against him for exercising his right to petition the courts. (*See* Doc. 1 ¶ 197; Doc. 13 at 18 (referring to the right to petition and retaliation claims collectively as the "First Amendment Claims"); *Id.* at 19 ("The Defendants retaliated against Carruth for positions that he took, or caused Alabama One to take, in court. Specifically they retaliated against Carruth for suing the ACUA Defendants, Bentley, and Byrne.") Confusingly, Carruth has brought another count titled "Retaliation," in which he again argues that Defendants retaliated against him for his litigation activities. In an attempt to construe Carruth's allegations in his favor, the Court treats his Complaint as alleging both that Defendants prevented Carruth from petitioning the courts, and retaliated against Carruth for petitioning the Courts.

While the facts material to Carruth's Interference with the Right to Petition and Relation claims are essentially identical, a claim for retaliation is not the same as a claim for interference with the right to petition. For example, *Robles v. Kane* held that to state a claim for relief for a First Amendment Right to Petition Claim a prisoner can allege that a prison official prevented him from invoking judicial process, where another "aspect" of the Right to Petition Clause protects prisoners from retaliation for invoking judicial process. 550 Fed. App'x 784, 787 & n.5 (11th Cir. 2013).

Carruth presents no authority at all that supports his claim for interference with the right to petition the courts. He repeatedly cites cases dealing with claims of retaliation by a government entity against an individual petitioning the Courts, however, does not cite any authority to the extent that he claims Defendants interfered with his right to petition. *See, e.g.*, Doc. 13 at 19 (citing *Bennet v. Hendrix*, 423 F.3d 1247, 1256 (11th Cir. 2005) *and Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1405 (S.D. Fla. 2014).) Ultimately, the Court considers Carruth's relation claim below, which is based on Defendants' alleged actions in response to Carruth's litigation activities. As Carruth has not shown how Defendants have prevented his access to the courts outside of their retaliatory acts, his right to petition claim is dismissed.

### e. RETALIATION

In order to make out a claim for retaliation in violation of the right to petition the courts, a plaintiff must allege, "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005) (citations omitted).

In his Response in Opposition, Carruth identifies the following activities as being protected by the First Amendment:

> The Defendants retaliated against Carruth for positions that he took, or caused Alabama One to take, in court. Specifically, they retaliated against Carruth for suing the ACUA Defendants, Bentley, and Byrne. The timeline of this case makes it clear that heightened regulatory action peaked when Carruth amended the [*Carruth v.*] *Smyth* case to name Bentley as defendant[]. Indeed, Alabama One was conserved and Carruth terminated one day after Carruth and Alabama [One] filed their amended complaint.

(Doc. 13 at 19.) Appeal or petition to the courts is protected activity under the First Amendment. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes.").Thus, Carruth has fulfilled the first element of his retaliation claim by reference to his lawsuits against Defendants.

Carruth must next show that Defendants' "retaliatory conduct adversely affected [his] protected speech." *Bennett*, 423 F.3d at 1250. This second element requires Carruth to allege retaliatory acts by Defendants and how those acts "would likely deter a person of ordinary firmness from the exercise of First Amendment Rights." *Bennett*, 423 F.3d at 1254 (citing *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). In making this "ordinary firmness" determination, a court may not focus on the plaintiff's "subjective, actual chilling." *Id.* The termination of Carruth's employment by Moore acting as Administrator of the ACUA would likely deter a person of ordinary firmness from exercising his First Amendment rights. *See Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 726 (6th Cir. 2010) ("A person of ordinary firmness would be deterred from engaging in protected conduct, if as a result, a public official encouraged her employer to terminate the person's contract or to have her change her behavior.") Before moving on to the third prong of *Bennet*'s inquiry, the Court must address how exactly the termination of Carruth's employment was Defendants' retaliatory act—after all it was the Board of the ACUA that voted to conserve Alabama One, and Moore acting as Administrator of the ACUA that terminated Carruth.

There is no doubt that Carruth has pled specific factual allegations about Defendants' role in Carruth's first, temporary suspension by reference to specific requests made by Smyth in e-mails, as well as deposition testimony by Morgan, about Defendants' orders that Morgan needed to suspend certain persons at Alabama One. For example, in regards to the February 28, 2014 suspension of Carruth and other Alabama One employees, Morgan stated in a deposition that "both [Defendants] Byrne and . . . Bentley wanted something to happen at Alabama One, they wanted suspensions" and that Bentley told Morgan to suspend the Alabama One employees or resign. (Doc. 1 ¶ 94.)

Carruth and the other employees were eventually reinstated after instituting a statutorily provided-for suspension challenge in Alabama state court. Morgan resigned his position and was replaced by Moore in April 2014. Carruth alleges that during the interview process Moore was told by either Byrne or Bentley that Alabama One was a "'large problem' that she was going to have to deal with." (*Id.* ¶ 113.) After she became Administrator, Moore was also contacted by Smyth repeatedly. Smyth allegedly tried to exercise improper influence over Moore by making accusations against Alabama One and that he was friends with and a former law partner of Byrne.

Outside of these two exchanges, one of which did not include Defendants, Carruth includes no other well-pled allegations about how Byrne or Bentley were involved in the conservation of Alabama One or termination of Carruth once Moore became acting Administrator. Instead, he includes the type of legal conclusions that the Court must disregard under the *Twombly/Iqbal* pleading standard. Carruth makes the following conclusory statements in his allegations:

> 118. . . . Moore did not exercise any lawful "discretion" in carrying out regulatory activities against Alabama One. Rather, she improperly followed orders from state officials outside of her agency, the Defendants.

> 119. Pursuant to and in furtherance of the Defendants' scheme, Moore hired an outside auditing firm, Carr Riggs, to participate in the first examination of Alabama One since Moore took office, . . .

> 121. It was clear that nothing was going to get in the way of the bogus regulatory pressure former Governor Bentley, Byrne, and the Smyth Group intended to place on Alabama One and Carruth

> 139. On August 27, 2015 (the day after former Governor Bentley is added as a defendant to the 2015 Lawsuit), Moore and the ACUA (acting at the improper direction of the Defendants) granted Smyth's specific requests to place Alabama One into conservatorship and remove Carruth as CEO. Moore, again acting at the improper direction of the Defendants, also improperly forced and caused Alabama One to refuse to honor its obligation to indemnify Carruth for legal expenses associated with Carruth's statutory appeal of the conservatorship

> 140. . . . the only purpose served by placing Alabama One into conservatorship was to fulfill the Defendants' ongoing plan to punish Carruth . . . .

141. The ACUA (acting at the direction of the Defendants) took these actions of conserving the credit union and removing Carruth. The ACUA Board made their decision to conserve Alabama One based on intentionally inaccurate, incomplete and misleading information provided by Moore and others (at the direction of the Defendants).

144. The ACUA (through Sarah Moore acting at the improper direction and under the improper control of the Defendants) exercised its purported power as Conservator to promptly terminate Carruth without cause and in a manner that violated the terms of his employment contract with Alabama One.

(*Id.* ¶¶ 118, 119, 121, 139-41, 144.) The allegations quoted by the Court above are simply conclusory allegations and "naked assertions" without "further factual enhancement," *Iqbal*, 556 U.S. at 678, that Defendants "directed" Moore and the ACUA, or that Moore and the ACUA were acting at the direction of Defendants. Indeed, most of the above allegations about Defendants' "control" over Moore and the ACUA are synonymous with the very allegations that *Iqbal* held to be conclusory. *See id.* at 680-81 ("The complaint alleges that Ashcroft was the 'principal architect' of this invidious policy, and that Mueller was 'instrumental' in adopting and executing it. These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." (citations and quotation marks omitted)). Carruth provides no allegations that Moore was directed by Defendants to initiate regulatory actions against him and Alabama One.

That the above quoted statements are "conclusory" becomes elucidated by reference to the causal standard necessary for Carruth to continue his retaliation claim (or indeed any of the other claims Carruth brought based on the conservation of Alabama One and termination of Carruth). *Dixon v. Burke County*, considering a § 1983 action against certain government officials who had asserted qualified immunity, described the causal requirements of a § 1983 action as "similar to the common law of Torts." 303 F.3d 1271, 1275 (11th Cir. 2002). A plaintiff must therefore allege "an adequate causal link between the alleged harm and the alleged unlawful conduct." *Id.* Such a causal link is broken where, "the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." *Id.*; *see also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the 'cat's paw' theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee."). Thus, where Carruth alleges that Defendants had "improper control" over Moore and the ACUA Board, or alleges that those decision-makers were "acting at the direction" of Defendants, Carruth has made nothing more than conclusory

allegations about the cause of the conservation of Alabama One and his termination. Throughout all of his conclusory allegations, Carruth can point to no non-conclusory allegations about *how* Defendants exercised "improper control" over the decision-makers or the directions that Defendants gave. The closest Carruth comes is his reference to the statement by Defendants to Moore that Alabama One is a "problem"—but this was over a year before the vote to conserve Alabama One.

Nor does Carruth include any well-pleaded allegations about how Defendants improperly influenced or controlled the ACUA Board. He pleads two alternatives, the first is that "the ACUA Board made their decision to conserve Alabama One based on intentionally inaccurate, incomplete and misleading information provided by Moore and others (at the direction of the Defendants)." (Doc. 1 ¶ 141.) Again, Carruth concludes that the Defendants directed Moore to do so, and includes no well-pleaded allegations to that effect. In the alternative, Carruth states:

> Alternatively, the ACUA Board members were complicit in the decision to conserve Alabama One and remove Carruth as CEO without regard to whether there was a legitimate justification for such action and simply adopted the directive of Moore and the Defendants without exercising any discretion or independent judgment whatsoever. In this regard (stated in the alternative), the ACUA Board members were co-conspirators with the Defendants, Moore, and the other co-conspirators in the conspiracy alleged herein.

(*Id.*) Carruth has pled no specific facts about the alleged conspiracy in the alternative, but again makes a legal conclusion concerning the existence of a conspiracy to conserve Alabama One.

Ultimately, Carruth has failed to show that the "retaliatory acts" of which he complains—the conservation of Alabama One and termination of Carruth—were caused by Defendants. Instead, from the non-conclusory allegations in the complaint, it appears that the ACUA Board voted to conserve Alabama One, and then Moore terminated Carruth. Carruth has offered plenty of well-pled allegations that Smyth attempted to influence Defendants by repeatedly contacting them with improper requests to take action against Alabama One; that Defendants met with Smyth on multiple occasions *during the time Morgan was Administrator of the ACUA*; that Defendants appeared to have improperly directed *Morgan*—but not Moore—to improperly conserve Alabama One. The well-pled allegations concerning Moore, however, do not show she acted at the direction of Defendants when she escalated regulatory sanctions against Alabama One, nor does Carruth explain how Defendants influenced the ACUA Board to conserve Alabama One.

### f. CONSPIRACY

Carruth's final claim under 28 U.S.C. § 1983 states that Defendants have engaged in a conspiracy to conserve Alabama One and terminate Carruth.

Although Defendants have asserted in their Motion to Dismiss that they are entitled to qualified immunity on all of Carruth's § 1983 claims, Carruth has made no argument as to why Defendants are not entitled to qualified immunity in regards to his conspiracy claim. Carruth has therefore not met his burden. *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003) (Once a defendant has established they were acting in their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.) Carruth's conspiracy claim is due to be dismissed.

### iii. STATE-LAW CLAIMS

Carruth has additionally pled a number of state-law claims against Defendants, however, as all claims that give rise to this Court's jurisdiction have been dismissed, it declines to exercise supplemental jurisdiction over these remaining state-law claims. As these state-law claims do not arise under the "Constitution, laws, or treaties of the United States," the Court does not have the power to exercise federal question jurisdiction over them. 28 U.S.C. § 1331. Nor are the parties diverse, as Carruth and Defendants appear to be residents of Alabama. Thus, subject-matter jurisdiction is additionally lacking under 28 U.S.C. § 1332. While the Court does not possess original subject matter jurisdiction over these state-law claims, it retains the discretion to continue to hear these state-law

claims by exercise of supplemental jurisdiction. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1362 (11th Cir. 2016) ("[W]here there is a basis for federal jurisdiction, the district court must exercise its supplemental jurisdiction over related state law claims unless a statutory exception applies.").

The Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c), as Carruth's state-law claims are the sole remaining claims. *See id.* § 1367(c)(3). Alabama state courts, not federal court, are the proper forum to navigate Carruth's state-law claims. The stage of these proceedings is early as discovery has not even begun. *Carlsbad*, 556 U.S. at 640-641. Thus, Carruth's state-law claims are due to be dismissed without prejudice.

## IV.    MOTION UNDER RULE 41(D)

Defendants additionally move under Federal Rule of Civil Procedure 41(d) for the Court to require Carruth to pay the costs and attorneys' fees incurred defending against Carruth's claims in *Carruth v. Smyth*. Rule 41(d) provides that: "If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied."

The parties disagree as to whether Rule 41(d) allows a Court to tax not only costs but also attorneys' fees. The text of Rule 41(d) itself only refers to "costs." In order to give this federal rule "teeth," some circuits have determined that Rule 41(d) permits the awarding of attorneys' fees as part of costs. *See, e.g.*, *Andrews v. Am.'s Living Centers, LLC*, 827 F.3d 306, 309 (4th Cir. 2016); *see also Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 874 (6th Cir. 2000) (The rule likewise exists to prevent attempts to "gain any tactical advantage by dismissing and refiling th[e] suit." (citation omitted) (alteration in original)); *Simeone v. First Bank Nat'l Ass'n*, 971 F.2d 103, 108 (8th Cir. 1992) (Rule 41(d)'s purpose is "to serve as a deterrent to forum shopping and vexatious litigation.").

Three different interpretations of Rule 41(d) have arisen, and as the Eleventh Circuit has not been asked to decide this particular question, the Court briefly summarizes each approach. The most definite in application is the Sixth Circuit's approach under *Rogers v. Wal-Mart Stores, Inc.*, which states that attorneys' fees are never recoverable under Rule 41(d). 230 F.3d at 874. *Rogers* based its holding on the premise that Congress would directly provide for attorneys' fees in the text of Rule 41(d) rather than just saying "costs" and allowing courts to guess at the meaning. This approach is especially enticing as the Federal Rules of Civil Procedure are usually explicit in rules where attorneys' fees

are provided for. *See, e.g.*, Fed. R. Civ. P. 30(g) ("A party who, expecting a deposition to be taken, attends in person or by an attorney may recover reasonable expenses for attending, including attorney's fees . . . ."); Rule 37(a)(5) ("the court must . . . require the party or deponent . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."); Rule 56(h) (". . . the court--after notice and a reasonable time to respond--may order the submitting party to pay the other party the reasonable expenses, including attorney's fees . . . .").[5]

Both the Eighth and Tenth Circuits have provided that attorneys' fees can be awarded under Rule 41(d). *See Meredith v. Stovall*, 216 F.3d 1087 (10th Cir. 2000); *Evans v. Safeway Stores, Inc.*, 623 F.2d 121, 122 (8th Cir. 1980); *see also Robinson v. Bank of Am., N.A.*, 553 F. App'x 648, 652 (8th Cir. 2014). It would be an understatement, however, to say that these opinions were sparing in the reasoning underpinning their holdings. These decisions proceed under the assumption that Rule 41(d) allows a court to award attorneys' fees, without trying

---

[5] There does exist one terminological exception to this clean split between "costs" and "attorneys' fees." Rule 54(d) allows a court to impose "costs other than attorneys' fees" and/or "attorneys' fees." *See* Rule 54(d). The reference to "costs other than attorneys' fees" would seem to indicate that costs would normally include attorneys' fees. But there is no indication that terminology of Rule 54(d) would support a wholesale change to the meaning of "costs" throughout the Federal Rules, especially where the Rules at other points only make provision for the award of costs or attorneys' fees. It thus appears that Rule 54(d) is an aberration to the Rules' otherwise clear distinction.

to square this idea with the text of Rule 41(d), which only provides for costs. In that sense, these holdings are unhelpful as they begin and end with a conclusion.

Finally, both the Seventh and Eighth Circuits attempt a middle way between the other two competing interpretations. According to their interpretation, because "Rule 41(d) does not provide for an award of attorneys' fees as a matter of right . . . , a district court may award attorneys' fees under this rule only where the underlying statute provides for attorneys' fees [or where the court] makes a specific finding that the plaintiff has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Andrews v. Am.'s Living Centers, LLC*, 827 F.3d at 311 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)).

Before delving further into this "middle way," the Court notes that the statute anchoring Carruth's claims, 28 U.S.C. § 1983, does not provide for attorneys' fees for a prevailing defendant. Even if the Court was to adopt the Seventh and Eighth Circuit's reasoning, it would only award attorneys' fees under the second condition stated above, i.e., if it found that Carruth's behavior was in bad faith, vexatious, wanton, or oppressive. Ultimately, a court's discretion to award attorneys' fees when presented by a parties' bad acts comes down to its inherent power, rather than the text of Rule 41(d). *See Kreager v. Solomon & Flanagan, P.A.*, 775 F.2d 1541, 1543 (11th Cir. 1985) ("In *Alyeska Pipeline*, . . . the

Court detailed exceptions to the American Rule. Courts have the 'inherent power' to assess attorney's fees as a fine for the willful disobedience of a court order, or when a losing party has 'acted in bad faith, vexatiously, wantonly or for oppressive reasons.'" (quoting *Alyeska Pipeline*, 412 U.S. at 258)). Allowing the awarding of attorneys' fees in such a case also squares with prior Eleventh Circuit holdings that Rule 41(a)(2) allows attorneys' fees despite there being no express reference thereto under the Rule. *McCants v. Ford Motor Co.*, 781 F.2d 855, 860 (11th Cir. 1986).

The Court finds that the correct interpretation of Rule 41(d) that both respects the inherent power of the courts, prevents abuse of judicial process, and—most importantly—respects the text of Rule 41(d) itself, requires that attorneys' fees can only be awarded where the Court makes a finding that the re-filing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. The text of Rule 41(d) simply cannot support the awarding of attorneys' fees as "costs" as a matter of course, especially where the drafters of the Federal Rules of Civil Procedure simply say "attorneys' fees" when they wish for a court to award them. Defendants' interpretation of Rule 41(d) would make common the often drastic penalty of the award of attorneys' fees, without inquiry into why the party

voluntarily dismissed the prior action, which is clearly not supported by the text of Rule 41(d) itself.

Defendants have not shown how the dismissal of Defendants from *Carruth v. Smyth* and institution of this action was in bad faith, vexatious, wanton, or for oppressive reasons. They argue they were prejudiced by not being able to take part in the Court-ordered mediation in *Carruth v. Smyth*, which at its core appears to be an argument that Carruth acted vexatiously by not continuing to sue them. They then point to other occurrences outside of Carruth's control that supposedly warrant the imposition of attorneys' fees. Specifically, they state (1) that they did not have the opportunity to get "key exculpatory testimony" from Jay Smyth, who passed away prior to the beginning of this new action and (2) Defendants are no longer in the Governor's office and have lost access to evidence to support their defense. Carruth was not the cause of either of these occurrences, and had no way to know that they would happen when he voluntarily dismissed his suit. Thus, Defendants' request for attorneys' fees under Rule 41(d) is due to be DENIED. On the other hand, Rule 41(d) does not require any finding of bad faith for vexatiousness for the award of costs, and Defendants' Motion under Rule 41(d) is due to be GRANTED to the extent it requests costs incurred during the time Defendants were parties in *Carruth v. Smyth. See Pontenberg v. Boston Sci. Corp.*,

252 F.3d 1253, 1256 n.2 (11th Cir. 2001); *id.* at 1260 ("Where the 'practical prejudice' of expenses incurred in defending the action can be 'alleviated by the imposition of costs or other conditions,' the district court does not abuse its 'broad equitable discretion' in allowing a plaintiff to voluntarily dismiss action and later refile the action if the plaintiff pays defendant's costs in earlier action." (quoting *McCants*, 781 F.2d at 859). Defendants are directed to file with the Court an itemized list of costs so incurred in *Carruth v. Smyth*, 7:15-cv-1089-LSC, along with a separate itemized list of the costs claimed in this case. The clerk will enter a cost bill awarding the costs in both under this case.

## V. Conclusion

For the reasons stated more fully above, Defendants' Motion to Dismiss is due to be GRANTED, with Carruth's § 1983 claims dismissed from this action with prejudice and Carruth's state-law claims dismissed without prejudice. Defendants' Motion under Rule 41(d) is due to be GRANTED IN PART and DENIED IN PART. An Order consistent with this Opinion will be entered separately.

**DONE** AND **ORDERED** ON APRIL 27, 2018.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485